[No. B022400. Second Dist., Div. Seven. Mar. 28. 1988.]

Estate of CONRAD NICHOLSON HILTON, Deceased.
WILLIAM BARRON HILTON, Petitioner and Appellant, v.
CONRAD N. HILTON FOUNDATION et al., Objectors and
Appellants.

**COUNSEL**

Gibson, Dunn & Crutcher, Ronald E. Gother, Marc R. Isaacson, Wayne W. Smith, Mark S. Pecheck and George W. Mull for Petitioner and Appellant.

Witter & Harpole, James E. Bates, in pro. per., Myron E. Harpole, John K. Van de Kamp, Attorney General, James M. Cordi, Deputy Attorney General, Loeb & Loeb, Andrew S. Garb, Robin Meadow, James R. Birnberg, Jeffrey M. Loeb, Graves, Dougherty, Hearon & Moody, Thomas J. Brorby, Pollard, Bauman, Slome & McIntosh, Henry Pollard, Hufstedler, Miller, Carlson & Beardsley, Otto M. Kaus and Joseph L. Wyatt, Jr., for Objectors and Appellants.

## Opinion

## REESE, J.*—

### I. INTRODUCTION AND STATEMENT OF ISSUES ON APPEAL

Conrad Nicholson Hilton (decedent or testator), multimillionaire hotel magnate and philanthropist, died testate on January 3, 1979. After an unsuccessful contest by his daughter, his will was admitted to probate on May 16, 1980. The present litigation began on November 13, 1980, when William Barron Hilton (Hilton), oldest surviving son of decedent and coexecutor of his estate, filed a petition under former Probate Code section 854 seeking authority, pursuant to an option granted him in decedent's last will,[1] to purchase all of the estate's Hilton Hotels Corporation (HHC) stock at its value as appraised on the date of decedent's death. Hilton's request to the trial court to suspend his powers as coexecutor of the estate pending final disposition of this litigation was granted by the court on April 4, 1983. The petition and responses raised a number of issues concerning the acquisition of HHC stock in the residue of the estate.

The trial court pursuant to written stipulation of the parties severed three preliminary issues for trial. These same issues are before us on this appeal. They are:

---

* Assigned by the Chairperson of the Judicial Council.

[1] Paragraph EIGHTH (a) of decedent's last will dated October 31, 1973 reads:

"EIGHTH: (a) RESIDUAL BEQUEST TO CONRAD N. HILTON FOUNDATION.

"I give, devise and bequeath all of the rest, residue and remainder of my estate, of whatsoever nature and wheresoever situated, including all lapsed and failed gifts, devises and bequests, to the CONRAD N. HILTON FOUNDATION, incorporated in the State of California on or about February 21, 1950 as a charitable corporation under the provisions of Part I of Division 2 of Title 1 of the Corporations Code of the State of California, to be held by said CONRAD N. HILTON FOUNDATION for the uses, purposes and beneficiaries, and subject in all respects to the provisions of the Articles of Incorporation and By-Laws of said CONRAD N. HILTON FOUNDATION, as amended, and subject to the provisions of this paragraph. *If any part of such residue bequeathed in this paragraph EIGHTH (a) to CONRAD N. HILTON FOUNDATION is, at the time of the distribution thereof, in excess of the permitted holdings of a private foundation, as those holdings are defined in the Tax Reform Act of 1969, or any amendment thereto, then I give and grant to my son, WILLIAM BARRON HILTON, an option to purchase such excess at the values as appraised in my estate, by giving a written notice of his intent so to do. My Executors are authorized, at their discretion, to accept from my said son in payment for such excess residue, interest bearing installment promissory notes executed by my said son, WILLIAM BARRON HILTON, and payable in equal annual installments not to exceed a period of ten (10) years from date of said note or notes.* If such option to purchase such excess is not exercised prior to the filing of a petition for final distribution, then said option shall expire and such excess shall be distributed to the MAYO FOUNDATION, of Rochester, Minnesota, to be applied on my obligations to provide certain charitable contributions, pursuant to the written contract dated June 15, 1972 between Conrad N. Hilton and said MAYO FOUNDATION." (Italics added.)

1. Whether the Conrad N. Hilton Foundation's (the Foundation's) conversion to a supporting organization, which permitted it to receive all of the estate's HHC stock, eliminated whatever rights Hilton would otherwise have under the option provided in paragraph EIGHTH (a) of decedent's will to purchase any of that stock;

2. Whether the Foundation could eliminate potential excess business holdings by assigning to a third party a portion of its expectancy in anticipation of distribution of HHC stock by the estate, thereby eliminating any rights Hilton would otherwise have under his option; and

3. Whether the power of sale contained in paragraphs SEVENTH and NINTH (b) of decedent's will[2] authorizes the executor to sell any of the estate's HHC stock in order to reduce or eliminate potential excess business holdings.

After a trial that spanned three weeks, the trial court issued an order[3] in the Foundation's favor on the first and second issues (the Support Organization Issue and the Anticipatory Assignment Issue) and in Hilton's favor on

---

[2] Paragraph SEVENTH of decedent's last will reads as follows: "SEVENTH: It is my specific intent that my Executors, during the period of probate and until the same is completed, shall vote all shares of Macdonald Properties, Inc., a California corporation wholly owned by me. *I authorize and empower my Executors, in their sole discretion, to sell all shares of Macdonald Properties, Inc.,* or to cause the sale of any or all of its assets, or to merge Macdonald Properties, Inc. into another corporation. Unless disposed of by such sales or merger, I direct my Executors to cause the liquidation and dissolution of Macdonald Properties, Inc. during the period of probate and prior to final distribution of my estate. In the event my Executors liquidate and dissolve, they are authorized to sell, lease or mortgage the whole or any part of assets, both real and personal, received from Macdonald Properties, Inc. at either public or private sale and with or without notice. The action of my said Executors and their good faith judgment in connection with this authorization and direction shall be at the risk of my estate, and the profits and losses, if any therefrom, shall inure to or be chargeable respectively to my estate and not to my Executors.

"The assets resulting from any such sales, merger or liquidation of Macdonald Properties, Inc. shall become part of the residue of my estate." (Italics added.)

Paragraph NINTH (e) of decedent's will reads: "(b) *My Executors are authorized to sell, lease or mortgage the whole or any part of my estate at either public or private sale, with or without notice, but subject to confirmation as may be provided by law.* I authorize my Executors to invest and reinvest any surplus money in their hands in every kind of property, real, personal, or mixed, and every kind of investment, specifically including but not limited to interest-bearing accounts, corporate obligations of every kind, preferred or common stocks, shares of investment trusts, investment companies, mutual funds, or common trust funds." (Italics added.)

[3] The trial court's order of June 11, 1986, from which the respective parties appeal reads in pertinent part as follows: "The following Petitions came on regularly for hearing in Department 21 of the above entitled Court, the Honorable Robert I. Weil, Judge presiding, and were tried on March 31, 1986, April 1, 2, 3, 7, 8, 9, 14, 15, 16, 17, and 18, 1986: ¶ "1. Petition of William Barron Hilton for Order Authorizing Co-Executors to Convey Personal Property Pursuant to Option in Will (Probate Code § 854), filed November 13, 1980;

the third issue (the Power of Sale Issue). All parties filed timely notices of appeal from the portions of the order adverse to them.

Other disputes between the parties, should they need to be litigated, await the determination of this appeal. They include such issues as whether Hilton properly exercised his option, and, if he did, the number of shares subject to the option and the proper purchase price for the stock.

---

"2. Response, Objections and Petition of the Conrad N. Hilton Foundation ("Foundation") for Determination of Interest (Probate Code § 1080), filed March 22, 1984;

"3. Response of William Barron Hilton to Objections and Petition of Foundation, dated May 23, 1984;

"4. Response, Objections and Petition of John K. Van de Kamp, Attorney General of the State of California, for Determination of Interests in Estate and for Declaratory Relief, dated August 15, 1984;

"5. Petition of James E. Bates, as Executor of the will of Conrad N. Hilton, deceased ("Bates") for Determination of Interest and for Instructions Regarding Requested Conveyance (Probate Code §§ 588 and 1020), dated September 12, 1983;

"6. Supplemental Petition of Bates for Instructions, filed October 3, 1984; and

". . . . . . . . . . . . . . . . . .

"The Court, after hearing said Petitions, and considering the evidence, both oral and documentary, finds that all notices of said hearing have been given as required by law; that the Foundation, having timely reclassified itself as a supporting organization in accordance with Internal Revenue Code Section 509(a)(3), is entitled to receive the entire residue of the estate under Conrad N. Hilton's will of October 31, 1973, including the Hilton Hotels Corporation stock, and William Barron Hilton is estopped from denying that said reclassification was timely; that nothing contained in said will expresses an intent by the decedent to prohibit, or prohibits, the Foundation from so reclassifying itself; that said reclassification is consistent with the decedent's intent as expressed in his will; and that the conditional option granted to William Barron Hilton under paragraph EIGHTH (a) of said will does not and will not become effective and was not intended by the decedent to become effective prior to the time of final distribution; that nothing contained in said will expresses an intent by the decedent to prohibit, or prohibits, the Foundation from making one or more anticipatory assignments of all or any portion of the residuary bequest; and that, interpreting the will on its face, the executor is granted powers of sale in Paragraphs SEVENTH and NINTH (b) of said will, which powers of sale cover Hilton Hotels Corporation stock, but said powers of sale were not intended by the decedent to be and cannot be exercised to sell any Hilton Hotels Corporation stock which exercise would have the effect of defeating said option under Paragraph EIGHTH (a) of decedent's will.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

"1. The aforesaid Petitions to Determine Interest filed by the Foundation and by the Attorney General and the Petitions to Determine Interest and Petitions and Supplemental Petition for Instructions filed by Bates are hereby *granted to the extent that the Foundation, reclassified as an Internal Revenue Code Section 509(a)(3) supporting organization, is entitled to receive the entire residue of the estate, and the executor is instructed that the entire residue of the estate is distributable to the Foundation, and no part of said residue is subject to the option contained in Paragraph EIGHTH (a) of decedent's will in favor of William Barron Hilton*;

"2. The aforesaid Petitions to Determine Interest filed by the Foundation and by the Attorney General and the Petitions to Determine Interest and Petitions and Supplemental Petition for Instructions filed by Bates are hereby *granted to the extent that the Foundation is authorized to make one or more anticipatory assignments of all or any portion of the residue of the estate, and the executor is hereby instructed that, subject to the provisions of Probate Code § 1020.1, in the event any such assignment is made prior to the time of distribution, the por-*

For reasons which follow, we reverse the trial court's ruling on the Support Organization Issue and on the Anticipatory Assignment Issue; we affirm the trial court's ruling on the Power of Sale Issue.

## II. FACTUAL AND PROCEDURAL SETTING

### A. *Pertinent Procedural History*

1. In addition and prior to filing the above petition for order authorizing coexecutors to convey personal property pursuant to option in will (Prob. Code, § 854) on November 13, 1980, Hilton forwarded three separate written notices to James E. Bates (Bates), coexecutor of decedent's estate, notifying Bates of Hilton's intent to exercise the option provided for in paragraph EIGHTH (a) of decedent's will. These notices were dated January 13, 1979, February 1, 1979, and November 3, 1980. (Exhibits 169, 170, 171.)

Under paragraph EIGHTH (a), the Foundation is the sole beneficiary of the residue of the estate, which consists principally of HHC common stock. That paragraph further provides: "*If any of such residue bequeathed* in this Paragraph EIGHTH (a) to CONRAD N. HILTON FOUNDATION *is, at the time of the distribution thereof, in excess of the permitted holdings of a private foundation,* as those holdings are defined in the Tax Reform Act of 1969, or any amendment thereto, *then I give and grant to my son WILLIAM BARRON HILTON, an option to purchase such excess at the values as appraised in my estate, by giving a written notice of his intent so to do.*" (Italics added.) Hilton in his three notices and in his petition requested authorization to purchase all shares of HHC in the residue of decedent's estate at date-of-death values.

2. The assets of the estate initially consisted, in part, of 6,825,700 shares of the common stock of HHC. Of these 5,553,932 were registered in the decedent's name at the date of death and 1,271,768 shares in the name of

tion of the residue of the estate so assigned is distributable in accordance with the terms of any such anticipatory assignment and will not be subject to the option contained in Paragraph EIGHTH (a) of decedent's will;

"3. The aforesaid Petitions to Determine Interest filed by the Foundation and by the Attorney General and the Petitions to Determine Interest and Petitions and Supplemental Petition for Instructions filed by Bates *are hereby denied to the extent that they seek instructions authorizing the executor to exercise the powers of sale contained in Paragraphs SEVENTH and NINTH (b) of decedent's will which exercise would have the effect of defeating the option contained in Paragraph EIGHTH (a) of said will, should any Hilton Hotels corporation stock be judicially determined to be subject to said option*;

"4. The Petition of William Barron Hilton for Order Authorizing Co-Executors to Convey Personal Property Pursuant to Option in will is hereby denied; and

"5. The Petition for Preliminary Distribution of Bates, as executor, filed May 8, 1985, was withdrawn by Bates." (Italics added.)

Macdonald Properties, Inc. (Macdonald), a corporation wholly owned by decedent. Macdonald was incorporated as a California corporation on November 23, 1954, for the purpose of holding some of the decedent's shares of HHC and thereby taking advantage of the 85-percent-dividends-received deduction contained in the federal income tax law, under which, as a general rule, a corporation pays income tax on only 15 percent of the dividends which it receives from other corporations.

The parties, by written stipulation filed with the trial court, agreed as follows:

a. The decedent owned in his own name approximately the following percentage of the outstanding HHC common stock on each of the dates set forth:

| | |
|---|---|
| February 15, 1973 | 16.6 percent |
| *October 31, 1973* | *18 percent* |
| *January 3, 1979* | *22.8 percent* |

b. Macdonald, a corporation wholly owned by decedent, owned in its name approximately the following percentage of the outstanding HHC common stock on each of the dates set forth:

| | |
|---|---|
| February 15, 1973 | 3.9 percent |
| *October 31, 1973* | *4 percent* |
| *January 3, 1979* | *5.2 percent* |
| | (Italics added) |

c. Individuals who are disqualified persons as to the Foundation owned approximately the following combined percentage of the outstanding HHC common stock on each of the dates set forth:

| | |
|---|---|
| February 15, 1973 | 3.86 percent |
| *October 31, 1973* | *4.08 percent* |
| *January 3, 1979* | *5.01 percent* |

d. The Foundation held approximately 1.3 percent to 2 percent of the outstanding HHC common stock at all relevant times.

e. The estate now holds approximately 27.4 percent of the outstanding HHC common stock.

f. The mean price (except as otherwise indicated) of HHC on the New York Stock Exchange as of each of the following dates is as follows:

| | |
|---|---|
| October 31, 1973 | $25.6875 (without adjustments for stock splits) |
| *January 3, 1979* | *24.1875* |
| February 14, 1979 | 22.0 (closing price) |
| February 28, 1979 | 23.25 (closing price) |
| July 3, 1979 | 28.125 |
| *November 3, 1980* | *39.25* |
| September 23, 1983 | 55.875 |
| *March 10, 1986* | *71.0* |

As indicated above, the estate at time of trial held approximately 28 percent of the outstanding HHC common stock and Hilton family members 6 percent thereof.

3. Hilton predicated his assumption that he was entitled to purchase all of the estate's HHC shares upon the following theory:

Section 4943 of the Internal Revenue Code, enacted in 1969, forbids certain charitable tax exempt organizations, called "private foundations" in the Tax Reform Act of 1969, from holding large controlling blocks of stock in business corporations. In general, a private foundation, such as the Foundation, together with certain other persons or entities, referred to in the Internal Revenue Code as "disqualified persons," may hold no more than 20 percent of the ownership of a business corporation. Disqualified persons include a major donor to a private foundation, and members of his family. Such holdings which exceed amounts permitted by section 4943 are referred to as "excess business holdings."

The option provision included in paragraph EIGHTH (a) (see fn. 1) of decedent's will fails to account for the fact that because the Tax Reform Act of 1969 restricts holdings of HHC stock by the Foundation and Hilton family members *combined* to a maximum of 20 percent of all outstanding stock, sale to Hilton, "a disqualified person" under section 4943, would not diminish the excess business holdings in the Foundation. At the time of trial, the combined holdings of the Foundation and the family members

were approximately 6 percent; therefore the Foundation could receive only about 14 percent from the estate and Hilton could have an option on the other 13 percent in the estate. The sale to Hilton would not reduce the amount of excess business holdings because it would not reduce the *combined* holdings of family members and the Foundation.

The permitted holdings of the Foundation (residuary legatee) in HHC stock are computed as follows:

(i) 20 percent, reduced by

(ii) *34* percent (the percentage of the voting stock owned by all disqualified persons)

 0 percent (permitted holdings)

4. The attorney who drafted the last will, Bates, testified that prior to drafting the same he made some calculations of the approximate number of shares which he believed were excess business holdings at the time. He stated he was unaware that the holdings of disqualified persons might reduce below 20 percent the amount of such stock that the Foundation could hold. He averred the decedent never said anything to him indicating that he (decedent) was aware of that possibility. Bates testified the decedent was aware of the restrictions imposed by Tax Reform Act of 1969 on the amount of shares of stock of any one corporation which could be owned by a private foundation. At any rate, the decedent was advised that due to restrictions imposed by the federal Tax Reform Act of 1969, his Foundation might not be able to hold more than 20 percent of the outstanding HHC stock. To meet this requirement, he was advised to include a provision in the will giving his son (Hilton) a contingent option to buy such stock, if any, as the Foundation could not hold. Decedent accepted that advice and the provision was placed in paragraph EIGHTH (a) of the will. (See fn. 1.)

5. In March of 1979 the surviving daughter of decedent, Constance Francesca Hilton, filed a will contest in this estate which was not finalized until March of 1983. During this period of four years all parties awaited the outcome of the contest before considering further action on the issue of the option.

6. Various counsel representing the Foundation, the executor, Bates, and Hilton commenced negotiating a possible settlement of the option issue after termination of the will contest. They tentatively agreed upon a price of $49 per share to be paid by Hilton and the terms of a 10-year promissory

note given in exchange for purchase of all of the HHC shares of the estate. During this period of amicable negotiation, a draft of a joint request for rulings on behalf of Hilton and the Foundation that purchase of the stock would not constitute a prohibited act of self-dealing under section 4941 of the Internal Revenue Code of 1954 was prepared, but not filed. Subsequently, in December 1983 Hilton filed a separate request with the Internal Revenue Service (IRS) and the Foundation filed its separate request in February 1984. Both received favorable rulings in early 1986. The negotiations terminated over inability to agree upon the terms of a collateral pledge agreement. At all times Bates consistently clarified his position to be that he opposed the sale and that he desired instructions and approval from the probate court prior to giving his final approval to any disposition. On September 13, 1983, he filed his response to Hilton's 1980 petition, and on March 22, 1984, filed a further response and objections to that petition. On August 15, 1984, the response and objections to Hilton's petition were filed by the Attorney General of the State of California.

7. On December 5, 1985, counsel for Bates filed a motion to vacate and strike inheritance report and order approving inheritance tax report. The basis for the motion was insufficiency of the stock valuation by the inheritance tax appraiser of $24.1875 per share in the face of the fact that as of December 31, 1978, three days before decedent's death, the professional appraisers employed by HHC placed the net asset value of the shares at approximately $48.764 per share. The motion was subsequently granted, and, as of the time of trial, there was no inheritance tax report or order approving the same on file in this estate.

B. *Conversion of the Foundation*

1. On February 16, 1984, the Foundation filed a request with the IRS for a ruling allowing the Foundation to receive all of the estate's HHC stock under the "grandfathering" provisions of Internal Revenue Code section 4943(c)(5). On January 31, 1986, the IRS ruled that the Foundation does not qualify for the section 4943(c)(5) "grandfathering" exemption.

On October 4, 1985, the Foundation, after amending its articles of incorporation, caused to be filed with the IRS a request for a ruling that the Foundation qualified as an Internal Revenue Code section 509(a)(3) supporting organization. The Foundation was duly reclassified as a supporting organization and terminated as an Internal Revenue Code private foundation on January 31, 1986, and February 7, 1986. The IRS further ruled that the Foundation is not subject to excess business holdings restrictions, and that all of the estate's shares of HHC stock will be permitted holdings of the reclassified Foundation.

Shortly before trial, the Foundation also caused a second organization to be formed named Conrad N. Hilton Private Foundation (New Private Foundation) whose articles are substantially the same as the previous articles of the Foundation. It is contemplated by the Foundation that about half of the estate's HHC stock and all of the Foundation's other assets may be transferred in a reorganization to the New Private Foundation. The IRS ruling contemplated this possibility and ruled that such transfers, if any, would not adversely affect the exemption from excess business holdings ruling.

### C. Philanthropic Philosophy and Activity of Decedent

Throughout the greater portion of his adult life the decedent exhibited a sincere and dedicated interest in philanthropy, having in 1944 formed the Foundation as a charitable trust and later incorporated it as a charitable corporation on February 21, 1950. During his lifetime he contributed millions of dollars to numerous eleemosynary causes through the Foundation and through direct grants or gifts. Commencing with the will he executed on November 19, 1947, the decedent, in 21 subsequent wills and 10 codicils, consistently bequeathed the residue of his estate to the Foundation with the exception of the years 1967 through 1970 when the Mary August Boye Foundation, another charitable foundation formed by the testator, was designated as the residuary beneficiary. When the Boye Foundation was dissolved in 1971, the Foundation received its assets.

Out of an estate valued in excess of $200 million in 1973, decedent made a little less than $1.75 million in noncharitable bequests to his two surviving sons, one daughter, grandchildren, other relatives, and unrelated persons, while leaving the residue of more than 99 percent of his estate to charity.

Each of the decedent's wills dating back to 1955, including his last will probated herein, contain a revelatory declaration which he drafted personally and instructed his scrivener to incorporate into his will.

Paragraph EIGHTH (b) contains that declaration, which reads: "To the Directors and Trustees of the said CONRAD N. HILTON FOUNDATION I bequeath some cherished conclusions formed during a lifetime of observation, study and contemplation:

"There is a natural law, a Divine law, that obliges you and me to relieve the suffering, the distressed and the destitute. Charity is a supreme virtue, and the great channel through which the mercy of God is passed on to mankind. It is the virtue that unites men and inspires their noblest efforts.

" 'Love one another, for that is the whole law'; so our fellowmen deserve to be loved and encouraged—never to be abandoned to wander alone in poverty and darkness. The practice of charity will bind us,—will bind all men in one great brotherhood.

"*As the funds you will expend have come from many places in the world, so let there be no territorial, religious, or color restrictions on your benefactions, but beware of organized, professional charities with high-salaried executives and a heavy ratio of expense.*

"Be ever watchful for the opportunity to shelter little children with the umbrella of your charity; be generous to their schools, their hospitals and their places of worship. For, as they must bear the burdens of our mistakes, so are they in their innocence the repositories of our hopes for the upward progress of humanity. *Give aid to their protectors and defenders, the Sisters, who devote their love and life's work for the good of mankind, for they appeal especially to me as being deserving of help from the FOUNDATION*. I know the SISTERS OF LORETTO very well, as it was this order who first established educational institutions in my home state of New Mexico. I have had an opportunity of observing the fine work they do. The SISTERS OF THE SACRED HEART is another order that I have assisted in Chicago, but there are many deserving support in other fields, particularly hospitals. *Deserving charities exist everywhere, but it is manifest that you cannot help all; so, it is my wish, without excluding others, to have the largest part of your benefactions dedicated to the Sisters in all parts of the world.*" (Italics added.)

Bates was decedent's confidant, personal attorney and friend from 1944 until decedent's death. Bates was the draftsman who drew each of decedent's wills and codicils commencing with the will of November 19, 1947. Bates and the decedent spent many hours together discussing decedent's business and legal affairs, as well as decedent's personal philosophy and beliefs with reference to the effect of inherited wealth upon the recipients thereof, and the moral duty of the wealthy to give generously to charitable causes. Without refutation, Bates testified the decedent expressed frequently his belief that children should make their own way in the world and should not receive great wealth from their parents. Bates testified the decedent advised him that his purpose in creating the Foundation in the first place was to leave the residue of his estate to charity; that decedent wanted his wealth to go to his Foundation.

The testimony of Bates before the trial court on April 1, 1986, was as follows:

"Q. At any time after you began to do legal work for Mr. Hilton did he ever tell you what his purpose had been in creating that trust?

"A. Oh, I am sure he did, and his purpose in creating that trust was to leave the residue of his estate to charity. And he intended at that time to have that residue taken over by the trustees that were appointed in that written trust, and by these trustees, over a period of time, disburse to charity.

"Q. Was this something that you and Mr. Hilton discussed at some point?

"A. I am sure we did. I cannot reach back that far in my memory, and pinpoint any specific time or place or put any words in his mouth, but I am positive that we had discussions concerning his reasons and purposes, so forth.

"Q. And as the years went on did you ever have later conversations with Mr. Hilton concerning this purpose that you say he described to you to leave the residue of his estate to the foundation so it could be held for charity?

"A. So many of them I can't even remember them. I had them constantly throughout the whole period I was drafting these wills.

"Q. Would these conversations generally come up in connection with your talking about new wills or codicils with Mr. Hilton?

"A. Generally they would come up in that connection, yes.

"Q. I certainly don't expect you to be able to remember each and every one of those conversations but can you give us the sense of what Mr. Hilton said on that subject in connection with your preparation of wills and codicils for him throughout the years?

"MR. SMITH: Objection to the question as being too general and calling for a narrative.

"THE COURT: Overruled. Do you want the question back, Mr. Bates?

"THE WITNESS: Yes, please read the—
 (Record read)

"THE WITNESS: He had 2 prime objectives, he discussed at length with me, throughout all these years. [¶] One of his objectives was to not leave unearned wealth to relatives and members of his family. He believed in a strong work ethic. His desire was to have all of his relatives, his children, get out and go to work and earn their own living. *He thought that and discoursed many times about the destructive effect that unearned wealth might have if it was inherited by young people before they had learned to work and understand how to handle it. [¶] So throughout all this period of time one of his objectives was to leave a minimum amount, minimum amount of wealth and to leave the entire residue of his estate, that was all this period of time getting ever greater and greater, to charity, and he wanted the bequest to charity administered through the foundation that he had set up for that purpose and incorporated for that purpose.* [¶] Prior to that time he wanted it handled through the trustees that had been appointed. *But after the incorporation he wanted the corporation to act as the administrator for the disbursement of this accumulating wealth to charity.*

"Q. Were you personally—

"A. Now, he never—he made over that period of time, as his wealth grew ever greater and greater, he made many different changes. But he never to my knowledge ever changed the primary objectives which was not to leave inherited wealth to the destruction, possible destruction of members of his family, but to give everything that he had accumulated back to the public through the charitable bequests that he had described time and time again in this series of wills." (Italics added.)

D. *United States District Court Judgment*

Hilton informed this court in his opening brief that he had filed an action in the United States District Court, Central District of California against the IRS and the Foundation challenging the validity of the IRS ruling which reclassified the Foundation as a support organization. On November 16, 1986, the district court, in civil No. 86-6029-FW, the Honorable Francis Whelan, judge presiding, granted Hilton's motion for summary judgment and ruled that the IRS had erroneously reclassified the Foundation as a support organization. Final judgment therein was filed on January 21, 1988.

Hilton has requested this court take judicial notice of the final judgment entered in the above case pursuant to Evidence Code sections 451, 452 and 453.

Pursuant to Evidence Code section 459, subdivision (d), this court notified each party in writing of this court's receipt of the request for special

notice in order to afford "each party reasonable opportunity to meet" the information of which this court has been requested to take judicial notice.

### III. TRIAL JUDGE'S FINDINGS

Following are portions of the trial judge's oral findings made from the bench on April 18, 1986, upon conclusion of argument by counsel with reference to the three principal issues involved herein.

(a) With reference to the Power of Sale Issue, the trial judge stated: "Number One. With respect to the matters that are before us here now as to the power of sale arguments both under paragraph 7, paragraph 9, and the 3rd one, the court interprets the will on the face of the will to be that although the executor does have the power of sale, *and although the executor may if he wishes use that power of sale to sell Hilton stock, and although the power of sale covers Hilton stock, as it covers any other asset in the estate, he cannot do it to the detriment of the option if the option were to cover Hilton stock.* Because it would make no logical or other kind of sense to give the option to Barron Hilton and then say that the power of sale can defeat it.

"This is not to impugn Mr. Bates' testimony, but a fair and adequate reading of the will I believe indicates that what Barron Hilton has been given is in fact a conditional, triple conditional bequest. The first condition is that it is an option and that means he can get it or not if he wants to. So there is one condition. He may choose to exercise it. He may not.

"The second condition is that it is an option that covers excess business holdings stock. The condition therefore being that at the time of its exercise there be excess business holding stock.

"The third condition is that it can be exercised only to the extent that excess business holdings stock exists as of the date of distribution.

"The court has been urged to rule that that distribution means preliminary distribution. I do not think that is a proper holding. Mr. Bates testified at least 4 times that the intent of the word distribution as used in the will and as discussed with the testator was final distribution. And I believe that that is one of the requirements of the option.

"That is not to negate the argument that Mr. Smith has made as to whether or not final distribution should or should not have already occurred, about which we will say more as we go along.

"*But with respect to the power of sale as it is found in the will, I would therefore not grant the instruction that the executor seeks insofar as the*

*executor seeks that instruction to say that the option—that the power of sale may be exercised to defeat the option."*

(b) With reference to the Support Organization Issue, the trial judge stated in pertinent part: "Number Two. I don't believe that there is anything in the law which prevents any beneficiary under a will from doing anything that that beneficiary might seek to do to better his, her or its lot as a beneficiary under the will.

"For example, on the one hand it is clear that no one—and when I say no one I include the testator, his executor and counsel, Mr. Bates, his tax advisor, Mr. Hubbs—no one for whatever reason perceived or realized that by creating this option it was possible that Barron Hilton could receive 100 percent of the shares in the estate. I think that to attribute that knowledge or the possibility of that knowledge to Conrad Hilton boggles the mind and stretches the imagination to a point which would not be appropriate. If his tax counsel, if the people he talked to, if no one seemed to know that— Conrad Hilton was a very wise man, but I cannot believe and I would not find that in his wisdom he alone would know that.

"And if in fact it had been his intent, because if it was that clear and that clear, and it had been his intent to give 100 percent of the stock to his son, then as I think I said yesterday there must have been an easier way to do it. That is why I can't believe that he knew it and left it in this form if there was some easier way to achieve that goal, if that indeed had been his testamentary intent.

"So, as I said, I do not believe the probate court has the power to regulate what a beneficiary, a devisee or legatee might seek to do under a will to better his, her or its lot.

"Barron Hilton under this option might I suppose if he wished seek to exercise it on a lesser sum than 100 percent of the stock, even though there are those three opinions from the three tax lawyers saying that if it were exercised in accordance with the normal flow of things it could end up at 100 percent, and Barron Hilton sought to maximize that which the law allowed him to do, and sought to exercise his option at 100 percent—again, as I said before, there is no law against rich people getting richer, and there is no moral stigma that should be imposed on anyone for seeking to do that.

*"On the other hand it is also equally clear that the Foundation under the law had the right to do whatever the law might permit it to do to improve its status in terms of what it might hope to receive as a beneficiary under the will.*

"I am reminded of the case of a grandfather who makes a will and says that 'I am going to leave a certain portion of my holdings to each of my grandsons who attains the height of 5 feet 10 inches at the time of distribution of my estate.'

"And you have got a runt in the family who goes and takes stretching lessons so that he can get up to 5 feet 10 inches. I don't think there is anything in the will that would stop that beneficiary from seeking to better his lot or improve his position.

"And therefore I don't think there is anything in the will that would stop or prevent the Foundation from seeking to convert itself to a support organization, if indeed by the creation of a support organization that would eliminate the excess business holding problem and therefore allow the Foundation to receive all of the shares.

"*The testimony has in fact convinced me that indeed that is the tax result of a support organization, so that the court would find that there is a support organization; that the Foundation has validly transmuted itself into such an entity and that by doing so subject to the remaining question as to the time, the Foundation in fact has managed by the use of that device to eliminate the excess business holdings that would otherwise be applicable to the shares if they were in the hands of the optionee.*

"*The last question in that regard it seems to me—I might also add that on my theory which says—and I think it is one that is supported by the law— that a beneficiary can do whatever is legally permissible for a beneficiary to do to improve his lot, I suppose that the Foundation might make an anticipatory assignment.*

"Whether that would be too late—after all that is not an act of the executor. I don't think the executor can do something that would favor one beneficiary over another as the case that was cited to me here today by Mr. Smith—I don't remember the name of it but I am sure he remembers it.

"There is language in there which says that the executor can't play one against the other, but the executor certainly does have a right to protect himself and to in an estate of this magnitude obtain whatever protections, whatever rulings and whatever relief he requires to be certain that what he is doing is within all aspects of the law.

"That then leads us to the final question as to whether or not this is all too late. Because I agree with Mr. Smith that the 'too late argument' is perhaps the single most crucial argument.

"And on that score I conclude that it is not too late. I conclude that it is not too late for a whole variety of reasons. They include the fact that certainly until the will contest itself finished, as I stated earlier, and it has been stated earlier, until the will contest finished obviously the executor could not do anything nor should the executor have done anything.

"To the extent that Barron Hilton wanted the matters to go forward more quickly, there was nothing that inhibited him from going forward more quickly. There were mutual reasons why others might want to go faster, why others might want to go more slowly.

"But, as Mr. Cordi himself said, it seems to me that the conduct of Barron Hilton in connection with the entire estate, including the obtaining of the rulings, is such that he certainly cannot be heard now to say that the estate should have closed in 1983.

"There is one very vital reason it seems to me why this could not and should not be true. Barron Hilton wore many hats in this transaction. It was in April of '83 that his powers as coexecutor were suspended. lt was some time later in '83 that I was told today that he stopped going to meetings of the Foundation.

"But the Foundation was in fact chaired and headed by Donald Hubbs, and Donald Hubbs, it seems to me, was somewhat in the position of Becket, if you remember your English history. And I think I have the right person.

"Donald Hubbs had been put into that position by his patron of 30 years, Barron Hilton, for whom he had been his accountant and his attorney.

"And indeed it was not until the attorney general first appeared that the Foundation ever realized that perhaps it should start considering alternatives that would legally permit it to maximize its opportunities in this situation.

"And I think they are legal alternatives that were considered and were ultimately adopted.

"And yet as I look at exhibit 192 I find that as late as May 15 of 1985 Mr. Hubbs is recommending against even the consideration of a support organization.

"Mr. Hubbs was in an intolerable position. He was in a very difficult position. He was the agent of Barron Hilton, he was the friend, the confidante, the attorney, the accountant. He fulfilled all these roles. He was

put into the presidency, as I understand it, of the Foundation at the suggestion of Mr. Hilton.

"And he is a good man. He was put in an impossible position. And it was not until he was able to I suppose freely assert himself with the other members of the board that the Foundation was able to undertake the course of conduct that led it to the support organization.

*"As to whether the support organization is or is not in fact the charitable equivalent of the private Foundation, with all respect to the entire argument, I think it is a monumental quibble.*

"Wherever Conrad Hilton is, I think that he would be pleased with what he sees. And I think everyone knows where Conrad Hilton may be. I think he would be pleased with what he sees in the charitable Foundation that remains as a public support organization.

"Certainly to the extent that 37 percent of the income is dedicated to the committee of the sisters, it is a means of articulating that which he had so eloquently himself expressed in that beautiful provision of his will dealing with his view of the sisters and their good works.

"And to the extent that the remaining 67 percent of the assets may go into a new private Foundation, that too would be something that I believe would certainly carry out the intent of the testator.

*"But my ruling here is not based on the intent of the testator except perhaps as to the use of the power of sale. Because the use of the power of sale is the only thing that we are really talking about that comes out of the will itself. The existence of the support organization, the timing, the conduct of the administration of the estate, the multiple hats and the conflicts of interest all have these postdated the death of the executor. And therefore they cannot speak as of the date of death.*

"I think it is fortuitous, and it was possibly planned that way, that the support organization as it is created, comes close to mirroring what Conrad Hilton might have wanted and did in fact want for his private Foundation.

*"But that is not the basis for the court's ruling.* Because it just happens that it was done that way and that seems to be the way that it has come out."

(c) With reference to the Support Organization Issue, the trial judge concluded: *"Also the Foundation does have the right and should be permit-*

*ted, and they can, to make an anticipatory assignment of any Hilton Hotel Corporation stock that would otherwise be excess business holding, although in view of my previous ruling I would suspect that that might be dicta."* (Italics added.)

IV. CONTENTIONS ON APPEAL

A. On appeal, Hilton basically contends as follows:

1. The trial court erred in finding the Foundation to be a valid support organization in that the Foundation has not made an irrevocable commitment to any public charities and was not timely in filing its application with the Internal Revenue Service.

2. Transformation to a valid support organization would be a substantial change in the structure of the Foundation and would be inconsistent with the decedent's testamentary intentions;

3. Utilization of the power of sale provisions of decedent's will, formation of a support organization and/or implementation of a contingency assignment plan are prohibited by the language of the decedent's will and his overall testamentary plan; and

4. Hilton's option is now vested, and the exercise and vesting thereof need not await the moment of final distribution.

B. Bates, the executor, the Foundation, and the Attorney General each contend as follows:

1. Hilton's option does not preclude the executor from exercising his general power of sale to dispose of potential excess holdings;

2. The decedent intended that the determination of the existence of excess business holdings, and therefore of the existence of the condition of Hilton's option, would be made at the time of final distribution;

3. The Foundation properly converted to a supporting organization, and therefore none of the stock will be excess holdings at the time of distribution; and

4. The Foundation may eliminate excess business holdings by assigning a portion of its residuary interest in the estate.

V. Discussion

A. *The Federal Judgment*

■ We find the trial court erred in finding the Foundation to be a valid support organization under Internal Revenue Code section 509(a)(3). We take judicial notice under Evidence Code sections 451, 452 and 453 of the final judgment entered on January 22, 1988, by the United States District Court for the Central District of California, in civil case No. 86-6029-FW, in which Hilton and the Foundation herein are parties. The United States District Judge in that judgment found the private letter rulings issued by the IRS to the Foundation dated January 31, 1986, and February 7, 1986, were erroneously issued and are invalid. That determination is binding upon this court in these proceedings. ■ "A federal judgment 'has the same effect in the courts of this state as it would have in a federal court.' [Citation.]" (*Younger* v. *Jensen* (1980) 26 Cal.3d 397, 411 [161 Cal.Rptr. 905, 605 P.2d 813].) We have been notified that an appeal from the federal judgment is now pending in the Ninth Circuit Court of Appeals. ■ The federal rule is that " 'a judgment or order, once rendered, is final for purposes of res judicata until reversed on appeal or modified or set aside in the court of rendition.' " (*Calhoun* v. *Franchise Tax Bd.* (1978) 20 Cal.3d 881, 887 [143 Cal.Rptr. 692, 574 P.2d 763].)

Standing alone, the trial court's erroneous finding that the foundation is a duly qualified support organization in face of the collateral estoppel effect of the federal judgment would warrant reversal on the support organization issue. However, because of the enormity of the estate as of the date of trial; the involvement of public policy considerations pertaining to charitable gifts, and the likelihood of a continuation of a multiplicity of lawsuits, we find it expedient to examine the issues herein upon more substantial grounds, rather than base our decision solely upon the Foundation's possibly correctable organizational defect.

B. *Scope of Appellate Review*

We begin our discussion with a statement of the applicable principles of appellate review governing the interpretation of wills.

In the seminal case on the subject, our high court states at page 205 of *Estate of Russell* (1968) 69 Cal.2d 200 [70 Cal.Rptr. 561, 444 P.2d 353]: ■ " 'The paramount rule in the construction of wills, to which all other rules must yield, is that *a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.* ' " (Italics added.)

At page 206, in footnote 8, the court in *Russell* further reasons:
■ " 'It is a fundamental and indisputable proposition that wherever doubt arises as to the meaning of a will, such doubt is resolved by construction and that construction is one of law,—it is an application of legal rule governing construction either to the will alone or to properly admitted facts to explain what the testator meant by the doubtful language. *In those cases where extrinsic evidence is permissible there may be conflict in the extrinsic evidence itself, in which case the determination of that conflict results in a finding of pure fact. But when the facts are thus found, those facts do not solve the difficulty. They still are to be applied to the written directions of the will for the latter's construction, and that construction still remains a construction at law* ' " (Italics added.)

Additional guideposts are furnished by the Supreme Court in its opinion in the case of *Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385] as follows: ■ "As set forth in *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839], *it is 'a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.' The possibility that conflicting inferences can be drawn from uncontroverted evidence does not relieve the appellate court of its duty independently to interpret the instrument; it is only when the issue turns upon the credibility of extrinsic evidence, or requires resolution of a conflict in that evidence, that the trial court determination is binding. (Parsons* v. *Bristol Development Co.,* 62 Cal.2d at p. 866, fn. 2.)[4] These same principles define the appellate function in the construction of wills. (*Estate of Russell* (1968) 69 Cal.2d 200, 212 [70 Cal.Rptr. 561, 444 P.2d 353].) . . .

"*In reaching that interpretation, we may utilize extrinsic evidence to aid in construing the will if we find that the will is 'ambiguous' or, more precisely, that in the light of both the language of the will and the circumstances under which it was made, the will is reasonably susceptible of more than one interpretation.* (See *Estate of Russell* (1968) 69 Cal.2d 200, 208-211 [70 Cal.Rptr. 561, 444 P.2d 353].)" (Italics added.)

---

"[4] Dolores contends that when the interpretation of a written instrument turns on conflicting inferences deducible from undisputed evidence, that interpretation adopted by the trial court must prevail on appeal if it is 'reasonable' and 'supported by substantial evidence.' (See *Estate of Northcutt* (1940) 16 Cal.2d 683, 690 [107 P.2d 607]; *Estate of Somermeier* (1971) 15 Cal.App.3d 224, 233 [92 Cal.Rptr. 872]; *Estate of Canfield* (1967) 256 Cal.App.2d 647, 655-656 [64 Cal.Rptr. 195].) As we pointed out in *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839], cases using such language are accurate only 'if they are interpreted, as they should be, to mean only that an appellate court must determine that the trial court's interpretation is erroneous before it may properly reverse a judgment. . . . *They do not mean that the appellate court is absolved of its duty to interpret the instrument.' We add that if, upon such intepretation, the appellate court determines that the trial court's interpretation is in error, it may not uphold the judgment merely because the trial court's error was reasonable.*" (Italics added.)

Pursuant to the principles delineated in the above cited authorities, it becomes our task to arrive at an independent interpretation of decedent's will herein since this case discloses no conflict in the extrinsic evidence, and no issues of credibility. Although substantial extrinsic evidence pertaining to the support organization and anticipatory assignment issues was admitted during the trial below, the record either discloses no conflict or issue of credibility, or that such evidence was found by the trial judge to be irrelevant to his decision. In announcing his ruling from the bench at the conclusion of the hearing on April 18, 1986, the trial judge stated in reference to the Support Organization and Anticipatory Assignment Issues: *"But my ruling here is not based on the intent of the testator except perhaps as to the use of the power of sale. Because the use of the power of sale is the only thing that we are really talking about that comes out of the will itself. The existence of the support organization, the timing, the conduct of the administration of the estate, the multiple hats and the conflicts of interest all have these postdated the death of the executor. And therefore they cannot speak as of the date of death."*

### C. Support Organization and Anticipatory Assignment Issues

In its order of June 11, 1986 (fn. 3), the trial court, in pertinent part, found "that the Foundation, having timely *reclassified itself as a supporting organization in accordance with Internal Revenue Code Section 509(a)(3),* is entitled to receive the entire residue of the estate under Conrad N. Hilton's will of October 31, 1973, including the Hilton Hotels Corporation stock, and William Barron Hilton is estopped from denying that said reclassification was timely; *that nothing contained in said will expresses an intent by the decedent to prohibit, or prohibits, the Foundation from so reclassifying itself; that said reclassification is consistent with the decedent's intent as expressed in his will;* . . . *'that nothing contained in said will expresses an intent by the decedent to prohibit, or prohibits, the Foundation from making one or more anticipatory assignments of all or any portion of the residuary bequest.'*" (Italics added.)

We disagree with the above findings of the trial court pertaining to the Support Organization and Anticipatory Assignment Issues and find its interpretation of decedent's will to be erroneous as to those two issues. After careful reading of the transcripts of the trial proceedings, examination of decedent's will and exhibits introduced, as well as intensive review of the briefs filed herein, we conclude that the trial court's construction of the will is inconsistent with and antagonistic to decedent's dominant testamentary intent. That intent or plan was twofold: To leave the great bulk of his vast wealth to charity through his private foundation without *"territorial, reli-*

*gious, or color restrictions"* and to form a bulwark against a compulsory forced disposition of his controlling block of HHC stock.

The testimony of Bates, the scrivener of decedent's last will, exhibits received into evidence, and paragraph EIGHTH (a) (fn. 1) of decedent's will, all lead to the inescapable conclusion that the decedent intended his residuary legatee to be his private Foundation although he knew it was not a support organization. As stated above, the decedent had incorporated the Foundation as a private charitable foundation on February 21, 1950, after having formed it as a charitable trust in 1944. Commencing with the will he executed on November 19, 1947, the decedent, in 21 subsequent wills and 10 codicils consistently bequeathed the residue of his estate to the Foundation with the exception of the years 1967 through 1970 when the Mary August Boye Foundation, another private charitable foundation formed by the testator, was designated as the residuary beneficiary. In decedent's last will before us there is no ambiguity in the designation of decedent's private Foundation as residuary beneficiary.

■ In spite of the clarity of paragraph EIGHTH (a) of the last will the trial court admitted extrinsic testimony as to whether a support organization was the same as a private foundation. We find no error in this procedure, for although " '. . . the terms of *any written instrument* are clear, definite and free from ambiguity the court must examine the instrument in the light of the circumstances surrounding its execution so as to ascertain what the parties meant by the words used.' [Citation.]" (*Estate of Webb* (1977) 76 Cal.App.3d 169, 174 [142 Cal.Rptr. 642].) ■ In examining the circumstances surrounding the designation of decedent's private Foundation as residuary legatee, we find the decedent was aware of the penalties imposed upon a private foundation pursuant to the provisions of the Tax Reform Act of 1969 where a private foundation possessed excess business holdings, as opposed to a public charity or support organization having such excess business holdings. With this knowledge, the decedent still retained his Foundation as a private foundation instead of converting it to a support organization. The testimony of Bates given during the hearing below relating a conversation of January 1972 between Bates and the decedent is supportive of this conclusion:

"Q. Did there come a point when someone told you that in addition to self-dealing provisions the 1969 Act also included what have become known as the excess business holding provisions?

"A. Yes.

"Q. Who told you that first?

"A. *Well, I think Mr. Hilton himself brought that matter up to me in one of our conversations.* He indicated that he had been talking with Father Tom Sullivan with reference to a bequest that he wanted to make to Father Tom in order to build a school. [¶] *And he told me that he understood that he might have some—might have some problems with reference to these excess business holdings and he specifically asked me to make an inquiry as to— from the Society of Jesus as to whether or not they were qualified under some IRS rule or regulation as being a public charity.* [¶] And in response to that request I got hold of Father Tom Sullivan—I think it was Father Tom that I got a hold of—and asked him who in the Society of Jesus would know about the regulations and the qualifications, and whether they had ever been issued a letter saying they were qualified as a public charity, and I wrote a letter to this gentleman and made inquiry, and he responded and gave me the information I was seeking. [¶] I reported that to Mr. Hilton. *He said 'Well, then, let's rewrite the will and make a bequest of these excess business holdings to the Society of Jesus because as a public charity they are not going to be amenable to the rules and regulations concerning excess business holdings or that extra 2 percent tax, and so forth, excise tax.'* [¶] So I believe it was the will of—was it January—January 26, '72?

"Q. That is correct?

"A. January—I did as he instructed and he made a specific bequest in that will to the Society of Jesus who had qualified as a public charity. [¶] And at that point then we had no further problem with excess business holdings."

■ The record reflects several fundamental differences between a private foundation and a public charity or support organization. Generally, a private foundation is one which is exempt from income taxes under section 501(c)(3) of the Internal Revenue Code of 1954. It has comparatively unrestricted liberty in selecting the objects of its charitable programs each year to which it must contribute 5 percent of its net asset value. The principal contributor to a private foundation has considerable control. He may designate the private foundation's directors, and has an opportunity to suggest gifts, research and programs. The public charity or support organization, contrastingly, must be operated in connection with one primary beneficiary charity, to whom it must donate at least one-third of its annual income, with the balance being earmarked for certain other specific charities. The beneficiary charity controls its programs and expenditures. The testator, in his conversation with Bates in January of 1972, pointed out two further significant differences between the private foundation and the support organization, that the public charity or support organization is "not amenable to the rules and regulations concerning excess business holdings or that extra 2

percent tax, and so forth, excise tax" to which the private foundation is amenable. The record is clear to the effect that the decedent deliberately chose not to convert his private foundation to a support organization in order to escape the excess business holdings penalties or to perpetuate control of his HHC shares. We cannot use our hindsight to substitute the discretion of the decedent as indicated in his will. " 'The court must determine the true meaning of the instrument in light of the evidence available. It can neither exclude extrinsic evidence relevant to that determination *nor invoke such evidence to write a new or different instrument.*' " (*Estate of Russell, supra,* 69 C.2d at p. 209.) We hold the Foundation is entitled to receive the residue of the estate as a private foundation, and not as a support organization; that it is prohibited by the testamentary plan of the testator from making anticipatory assignments of any part of the residue of said estate prior to final distribution thereof; and that it receives such residue subject to said option.

### D. *The Option*

The trial court ruled in its order of June 11, 1986, that the Foundation, reclassified as an Internal Revenue Code section 509(a)(3) supporting organization, is entitled to receive the entire residue of the estate and that no part of said residue is subject to the option contained in paragraph EIGHTH (a) of decedent's will in favor of Hilton. The trial court further found that the option was conditional and will not become effective and was not intended by the decedent to become effective prior to the time of final distribution.

 We find the trial court erred in its rulings relevant to the option. Our analysis of decedent's testamentary plan as reflected in the record and his will leads us to conclude that the option granted decedent's son was an integral part of decedent's second dominant intent: to perpetuate control of his HHC shares through his private foundation, the directors of whom were revered friends and business associates of longstanding, and/or through his surviving son, Barron Hilton, obtaining control of said shares. In this manner, the decedent reasoned, the splitting of his controlling block of HHC stock would be delayed, hopefully, permanently, and thus an unfriendly takeover made unlikely. Of decisive import are the contents of exhibit No. 116A introduced during the hearing below. This exhibit consisted of a copy of a letter written by Bates to Hilton on October 2, 1980, and the attachments thereto consisting of relevant portions of testimony given by Bates in

a deposition taken during the will contest proceedings previously mentioned. The pertinent portion of the letter follows:

"October 2, 1980
"Mr. Barron Hilton
"Chairman, President and Chief Executive Officer
"Hilton Hotels Corporation
"9990 Santa Monica Boulevard
"Beverly Hills, California 90212
"Dear Barron:

"Since disclosure to you of the contents of your father's will, you have been independently advised with respect to the option granted you therein, and so I write this letter not to persuade or dissuade you concerning any decision you may make, but to refresh your recollection and inform you concerning certain aspects of the option that now require some timely attention on your part.

"The option does not transfer or purport to transfer, nor was it intended to transfer any beneficial interests or values of the estate to you in any manner as would cause a loss of values to the Conrad N. Hilton Foundation. *The specific and sole purpose of the option was to give you the opportunity for a better posture of defense against what your father believed would be a risk of an unfriendly takeover attempt in the event the Foundation was compelled to sell the 'excess' stock within the five year period as required by the 1969 Tax Act. For your convenience and review I am attaching some excerpts from my sworn deposition testimony concerning your father's discussions with me, and his purpose and intent in granting you the option. The facts related therein are the only existing evidence on the point in so far as I know.*

"*A compulsory sale resulting in a 'risk' of an unfriendly take-over was, in 1973 and prior thereto, considered to be very real and substantial by both your father and me.* Because of the tremendous financial gains made by Hilton Hotels since the will was written in 1973, it is possible that such risk, as we viewed it seven years ago, either no longer exists, or if it does it has materially lessened to the point where you may, at this later date, want to reappraise such risk and reconsider the enormous personal cost to you to bolster up Hilton's so-called 'defensive posture' by consummating the option. *You have resources to financial and other information concerning the present degree of this risk that are not available to me, so I must leave it entirely to you to make any such reappraisal, if you feel that one should be made.*" (Italics added.)

The relevant portions of Bates's deposition testimony are as follows:

"Q. I note that on Page 10 of Article EIGHTH at the top there's a provision that states—this begins on the last word of Page 9—It says 'If any part of such residue bequeathed in this paragraph EIGHTH (a) to CONRAD N. HILTON FOUNDATION is, at the time of the distribution thereof, in excess of the permitted holdings of a private foundation, as those holdings are defined in the Tax Reform Act of 1969, or any amendment thereto, then I give and grant to my son, WILLIAM BARRON HILTON, an option to purchase such excess at the values as appraised in my estate, by giving a written notice of his intent so to do."

"Did you have any discussion with Conrad Hilton concerning that provision?

"A. Yes.

"Q. Can you tell us when such a discussion first occurred, approximately?

"A. January and February of 1973.

"Q. Would you relate to us what Mr. Hilton said to you and what you said to him in the course of that discussion.

"A. *Well, Mr. Hilton raised a question that we had discussed many times before concerning the effect on Hilton Hotels Corporation when and if the Foundation received the residual bequests and got all of his stock and would then be compelled to make a public distribution of that stock pursuant to the 1976 Tax Reform Act.*

"MR. BATES: [*sic*] I believe you may have misspoken yourself, sir.

"MR. HARPOLE: Q. Is that the 1969 Tax Reform Act?

"A. Did I say 1976?

"MR. HUBBS: Yes.

"THE WITNESS: 1969 Tax Reform Act. 1969 Tax Reform Act is right. I am losing track of time.

"*As I understood the law to be at that time, and I discussed it with him, the provision of that 1969 Tax Reform Act required the foundation to divest itself within a five-year period of all of its excess holdings.*

*"Mr. Hilton's fear and the thing we discussed many times would be the effect on the corporation of such a divestment.*

*"He was constantly concerned for a long period of time about being the victim of an unfriendly merger attempt or a takeover attempt.*

*"He didn't consider that that was much of a risk during his lifetime because he owned 30 percent or better of the stock, but he considered that it would be a very real risk following his death, that an unfriendly takeover attempt might find a way to take possession of his beloved Hilton Hotels Corporation in the event that the Foundation had to disburse that stock within the five-year period of time as required by the 1969 tax act.*

"We discussed it at great length on many occasions and we discussed it just prior to the codicil that I drafted to the 1972 will, which I think was in February 1973.

*"I made the suggestion to Mr. Hilton—I stated something like this. I said 'Well, why don't you provide in your will that your son Barron, who you are relying upon now to carry forward this corporation for family interest, be given an option to buy all of that excess stock.'*

*"And his immediate reaction was and he stated 'he couldn't afford it. How in the world is Barron going to get enough money to buy that stock?'*

"Well, I said 'Mr. Hilton, I know he can't buy it now from his own resources, but Barron has got a lot of wealthy and powerful friends and if he has an opportunity to take over that stock, he might form some kind of a combine among his friends, a joint venture or some other basis, and pursuant to the option take that stock and protect it from an unfriendly takeover, as you fear would happen if that stock had to be disbursed by the foundation after distribution to the Foundation.'

"To that he said 'There's a possibility he could do that, but you are talking about too much money. Barron couldn't possibly take over that option.'

"Well, I said 'Give him a chance. At least you can open the door for him and make it as easy as you can.'

*"He said 'How can I do that. He has to buy it and pay for it.'*

*"I said 'Let him buy it and pay for it. Suppose you authorize your executors to let him purchase it on a ten-year instalment note. Make it as easy for*

*him as you can to acquire control of that stock and protect the Hilton Hotels Corporation from an unfriendly takeover.'*

"After considerable more discussion he said 'All right, you draft up an option and put it in the will and I would like to take a look at it.'

"And I drafted the paragraph and showed it to him and talked to him about it again and he said 'All right, put it in the will.'

"That's the first time that provision appeared in any of the wills.

"MR. HARPOLE: Q. You are referring to the codicil as being the—

"A. I am referring to the codicil of February 15, 1973." (Italics added.)

The foregoing evidence clearly sets forth the purpose and intent of the decedent in including the option in paragraph EIGHTH (a) of his will. It establishes that the decedent was fully aware that his Foundation would be required to divest itself of all excess holdings within five years after receipt thereof, and that such a divestiture posed definite problems of a possible compulsory sale or unfriendly takeover. The evidence leads us to conclude that the decedent was aware that all of his stock passing to the Foundation would be considered excess holdings under section 4943(c)(2)(A) of the Internal Revenue Code and subject to the option. That section provides that the "permitted holdings" of a private foundation in a corporation are 20 percent of the voting stock, reduced by the percentage of the voting stock owned by all disqualified persons. The term "disqualified person," under the act, includes, among others, a *substantial contributor to a foundation* or a manager of a foundation *and a member of the family of a substantial contributor* or a foundation manager. (Int.Rev. Code § 4946(a)(1)(A) and (a)(1)(D).) Other evidence presented to the trial court is inconclusive as to whether the decedent was familiar with the exacerbating effect a transfer to another disqualified person such as his son would have upon the 20 percent of HHC holdings his Foundation could hold without penalty. The record does establish, however, that the decedent had sufficient knowledge and experience in tax matters to understand the number of shares constituting "excess" could vary widely according to changes in IRS regulations and official rulings; acts by HHC in splitting, selling or redeeming shares; and actions taken by other disqualified persons holding HHC shares. Pursuant to section 4943(c)(2)(A) of the Internal Revenue Code, we find that the option granted Hilton covers all of the HHC stock in the residuary estate, including Macdonald shares, remaining as of March 31, 1986, date of commencement of trial below.

The option granted Hilton vested as of the date of death of decedent and expires upon the filing of a petition for final distribution in the event Hilton does not elect to exercise his option prior thereto. It was not conditioned upon there being in existence at the time of final distribution of the residuary estate "excess" shares. Whether that condition subsequent came into being or not, the right to purchase the excess shares, if any, came into being upon decedent's death.

It is a settled canon of California jurisprudence that because the law favors early vesting of estates, conditions precedent are disdained. This canon has been explicitly and strictly applied: "The law does not favor the creation of conditions precedent which have the effect of defeating the vesting of estates. Conditions in a deed or will should be strictly construed *in favor of the vesting of estates,* rather than to defeat the title intended to be conveyed by the instruments. . . . [¶] . . . '[C]onsequently a stipulation in a conveyance *or a devise* will be construed, if possible, not to create a condition. The courts will, by preference, construe language *as creating a convenant,* a trust, *or an equitable charge*. . . . [¶] . . . [A] condition precedent is construed strictly in favor of vesting the estate.' " (*Buttram* v. *Finley* (1940) Cal.App.2d 459, 464-465 [99 P.2d 1093].) (Italics by the court.) (See also *Estate of Alpers* (1967) 251 Cal.App.2d 40, 45 [58 Cal.Rptr. 841].) (Conditions must be precise and will be strictly construed in favor of the vesting of estates); *Estate of Riemer* (1945) 69 Cal.App.2d 634, 635 [159 P.2d 677].) (" ' "The law favors the vesting of interests, and every interest will be presumed to be vested, *unless a contrary intention is clearly manifest*." ' ") (Italics by the court.) (*Estate of Nathan* (1949) 89 Cal.App.2d 789, 791 [201 P.2d 865] [purported condition precedent treated as convenant because it had been substantially, but not literally, complied with].)

The option, having vested upon the death of decedent, was not subject to being divested or abrogated by actions of the Foundation in creating a support organization or making anticipatory assignments, or by the executor utilizing any of the powers of sale granted him in the will to defeat it. The option is, however subject to three conditions subsequent, one of which is the sole responsibility of Hilton; one of which is the joint responsibility of the executor, Hilton and the Foundation; and one of which was fulfilled at time of commencement of the trial below.

Hilton's sole responsibility was to give written notice of his acceptance of the option and his election to exercise the same. Hilton properly gave written notice of his acceptance and election by giving written notices to Bates as executor on January 13, 1979, February 1, 1979, and November 3, 1980. He perfected his acceptance by filing a petition under Probate Code

section 854 on November 13, 1980. (*Estate of Secreto* (1982) 134 Cal.App.3d 938, 947 [184 Cal.Rptr. 873].)

The second condition subsequent required Hilton, the executor and the Foundation to jointly enter into a good faith negotiation of the purchase price per share, number of shares, interest rates, security and other terms necessary to consummate the sale.[4] The record reflects that the parties commenced such negotiations but that the same stalled on the issue of collateral security for the promissory note, the parties having agreed as to the interest rate and purchase price per share.

We find the method adopted in the 1983 negotiations—attaching the price per share under the option to the net asset value per share as of date of decedent's death—to have been one feasible method of reaching an acceptable price per share. Another suggested method of fixing the price per share might be attaching the date-of-death estate appraised value to all shares over 20, with market values attached to the first 20 shares of the excess. A third method might be the setting of the price per share at the date-of-death estate appraised value, with the optionee, Hilton, being liable for the accrued interest at 9 percent from date of death. Other methods may be found more acceptable by court or counsel, but always in mind should be the decedent's intent to cause his son, Hilton, to pay a reasonable and fair price that Hilton can find economically feasible, while at the same time not depriving the Foundation of an unreasonable value in the residue.

The third condition subsequent attached to the option is that there must exist "*at the time of distribution thereof . . . any part of such residue in excess* of the permitted holdings of a private foundation, *as those holdings are defined in the Tax Reform Act of 1969,* or any amendment thereto.*" (Italics added.) We interpret the term "at the time of distribution thereof" to mean the time when the estate should have been ready for distribution, and not final distribution. The record herein glaringly reflects the executor, the Foundation, and Hilton engaging in legal maneuvers designed possibly

---

[4] This court is mindful of the fact that by written stipulation filed March 31, 1986, with the trial court, all of the "Option" issues, including without limitation: (a) the date or dates on which the option and its exercise was, or will be, effective; (b) the number of the estate's shares of HHC stock to which the option applies; (c) the option price or prices; (d) the permissible option terms; and (e) the effectiveness of option exercises, were not litigated or adjudicated. Due to the inextricable interweaving of the evidence presented to the trial court pertaining to the three issues of Supporting Organization, Power of Sale, and Anticipatory Assignment with those pertaining to the "Option" issue, this court, in order to aid counsel and the trial court in perhaps curtailing undue litigation, submits herewith its findings on the "Option" issue as guidelines on remand. (See Code Civ. Proc., § 909; 9 Witkin. Cal. Procedure (3d ed. 1985) Appeal, §§ 256, 257, pp. 262-264; *Estate of Stevens* (1945) 27 Cal.2d 108, 118 [162 P.2d 918]; *Filipino Accountants' Assn.* v. *State Bd. of Accountancy* (1984) 155 Cal.App.3d 1023, 1030 [204 Cal.Rptr. 913].)

to fulfill their desires and intent, but not necessarily those of the decedent, whose intent is paramount herein. (*Russell, supra,* 69 Cal.2d at p. 205.) ▪ "In the absence of any indication to the contrary a testator contemplates prompt distribution." (*Estate of Taylor* (1967) 66 Cal.2d 855, 858 [59 Cal.Rptr. 437, 428 P.2d 301].) ▪ The delay herein, however, we find to be inconsequential as to the issue of vesting of option rights in view of our holding above that Hilton's option rights vested as of the date of death of decedent, January 3, 1979. We interpret the term "at time of distribution" in paragraph EIGHTH (a) to designate the time when the excess holdings, if any, would be calculated prior to actual distribution thereof. A date certain has to be determined that is not exclusively dependent upon when the executor decides to file a final accounting. That time of ascertainment of the percentage of excess holdings, necessarily, has to be before final distribution as Hilton, by the option terms in the will, is given until the date of filing of the petition for final distribution during which to exercise his option to purchase. We find the estate was in a condition to be closed as of March 31, 1986, the date of commencement of trial proceedings below. As of that date, except for the completion of the second session of inheritance tax proceedings initiated by the executor, and these proceedings, the estate was in a condition to be closed and a petition for final distribution filed. As of March 31, 1986, pursuant to stipulation of the parties, the estate held 27.4 percent of the outstanding HHC common stock. As stated before, we find all of these shares to be "excess business holdings" and subject to Hilton's option.

E. *The Power of Sale Issue*

The trial judge made the following oral finding with relation to the Power of Sale Issue on April 18, 1986, upon conclusion of argument by counsel: "Number One. With respect to the matters that are before us here now as to the power of sale arguments both under paragraph 7, paragraph 9, and the 3rd one, the court interprets the will on the face of the will to be that although the executor does have the power of sale, *and although the executor may if he wishes use that power of sale to sell Hilton stock, and although the power of sale covers Hilton stock, as it covers any other asset in the estate, he cannot do it to the detriment of the option if the option were to cover Hilton stock. Because it would make no logical or other kind of sense to give the option to Barron Hilton and then say that the power of sale can defeat it.*" (Italics added.)

In his order of June 11, 1986, the trial judge found: ". . . and that, interpreting the will on its face, the executor is granted powers of sale in Paragraphs SEVENTH and NINTH (b) of said will, which powers of sale cover Hilton Hotels Corporation stock, but said powers of sale *were not intended by the decedent to be and cannot be exercised to sell any Hilton*

*Hotels Corporation stock which exercise would have the effect of defeating said option under Paragraph EIGHTH (a) of decedent's will.* (Italics added.)

We concur in the above findings. We additionally feel they are also applicable to the Support Organization Issue and the Anticipatory Assignment Issue.

## VI. DISPOSITION

The trial court's order of June 11, 1986, is reversed in those parts relating to the Support Organization Issue and Anticipatory Issue. Its order is affirmed as to the Power of Sale Issue. The matter is remanded to the trial court for further proceedings to be conducted in accordance with the views expressed herein. Each party to bear its costs on appeal.

Thompson, Acting P. J., and Johnson, J., concurred.

Petitions for a rehearing were denied April 25, 1988, and the petitions of objectors and appellants for review by the Supreme Court were denied June 23, 1988.