4 Cal.App.4th 1127 (1992)
6 Cal. Rptr.2d 363
Estate of MADELEINE VERDISSON, Deceased.
LAWRENCE KESSELRING, Petitioner and Appellant,
v.
EDWIN E. NOWAK, as Special Administrator, etc., Objector and Appellant.
Docket No. A053884.
Court of Appeals of California, First District, Division Three.
March 23, 1992.
*1131 COUNSEL
David C. Wheeler for Petitioner and Appellant.
Coblentz, Cahen, McCabe & Breyer, Charles R. Breyer and Jeffrey G. Knowles for Objector and Appellant.
OPINION
WHITE, P.J.
Madeleine Verdisson took her own life on June 3, 1987, leaving a substantial estate. In her pocket was a handwritten undated document titled "This is my Will and Testimony." The will contained only the following three bequests: "1) I leave my properties[[1]] to Edwin Nowak. [¶] 2) I leave my money to Lawrence Kesselring. [¶] 3) I leave my pets to Mr. Wardaman [Vardanian] and $20,000.00 to take care of them upon my death."
The present case involves a dispute between Messrs. Nowak and Kesselring concerning the proper interpretation of the words "properties" and *1132 "money" as used in the will.[2] The trial court concluded that "properties" referred to both real and personal property. Further, the court concluded that "money" did not encompass a $550,000 interest in a mutual fund, but did include a $100,000 return of premium on a life insurance policy. Kesselring has appealed from the trial court's decision to award the mutual fund to Nowak; Nowak has cross-appealed from the decision to award the returned life insurance premium to Kesselring. We affirm.

I

FACTS
Madeleine Verdisson was born and raised in France. In 1944, at the age of 16, she married an American soldier and moved to Chicago. She attended school and learned to speak English fluently. Sometime before 1958, her marriage ended[3] and she moved to San Francisco. She began working as a bookkeeper in San Francisco and also began investing in real estate. Eventually, her real estate holdings grew to the point where she was able to support herself exclusively on the income from her investments.

A. Madeleine's Relationship With Edwin Nowak.

In 1958, Madeleine met Edwin Nowak at a dance at the St. Francis Hotel. They began dating, and over the next 10 years they saw one another frequently, even living together for a short time. In 1968, Nowak asked Madeleine to marry him. She declined, however, because of what Nowak described as her consuming interest in real estate. Nevertheless, they remained on friendly terms and continued to see each other.
Nowak moved to Schenectady, New York, in 1968 to care for his aging father. He kept in regular contact with Madeleine while he was away, and resumed the relationship when he returned to San Francisco in 1972. Over the next six years they continued to see each other, although Madeleine also dated other men. In 1978, Nowak's work as an engineer required that he move to Ann Arbor, Michigan. During the two years he was away he kept in close contact with Madeleine.
When Nowak returned to San Francisco in 1980, he found Madeleine in a desperate emotional state. She had been severely beaten in a mugging, and, *1133 perhaps because of this, had spent some time in a mental hospital. During this period Nowak attempted to care for Madeleine, coming to her aid whenever she called. Madeleine's demands on his time eventually caused Nowak to lose his job. Although Nowak was unaware of it, Madeleine also began seeing Lawrence Kesselring during this period.
During the time Madeleine was dating Kesselring, Nowak saw her less often. However, in 1986 Nowak and Madeleine again discussed marriage. Nowak told her he did not want to get married because he feared his poor financial condition would compound her problems. Nevertheless, Nowak and Madeleine continued to see each other, getting together a least once a week, often to go grocery shopping. Because Madeleine told Nowak she was having trouble renting some of her properties, Nowak would pay for her groceries on these occasions.
In late 1986, Madeleine told Nowak that she intended to prepare a will leaving him everything she owned. After Madeleine's death, Nowak found a document among her personal effects which purported to do precisely that. The unsigned typewritten document was dated "2/13/87" and stated (with typographical errors omitted): "To: Edwin Nowak [¶] From: Madeleine Verdisson [¶] This my will to give to Ed Nowak everything I possess and in turn to take care of my dogs until they die."
Madeleine and Nowak maintained a close relationship until the day of her death. He last saw her when Madeleine visited him on May 31, 1987. Four days later Nowak called the police when Madeleine did not answer her phone. The police found her dead at home.

B. Madeleine's Relationship With Lawrence Kesselring.

In late 1981, near the end of her bout with depression, Madeleine met Lawrence Kesselring. During the first year of their relationship they saw each other very often, perhaps four to five days a week. However, in September of 1982 Kesselring began working the night shift at the San Francisco Veterans Hospital, where he was employed as a radiologic technologist. His work schedule did not permit him to spend as much time with Madeleine, but he still saw her about three times each week.
Madeleine and Kesselring would spend their time together dining out, visiting or eating at her home, and cleaning and maintaining Madeleine's various rental properties. During the relationship, Kesselring gave Madeleine expensive gifts, including a mink coat and $2,300 towards the purchase of an automobile. Kesselring testified he also gave Madeleine an engagement ring. He regularly gave her money for groceries and her utility bill.
*1134 The relationship between Madeleine and Kesselring was stormy. Bitter letters from Madeleine documented their disputes. In August of 1985, Madeleine wrote to Kesselring accusing him of neglecting her because of his love for money. She stated that "your only love is your money" and that those around him had to suffer because of it. She wrote him again in November of 1986, saying "I realize that your money is everything, your love, happiness and companion in life." She ended the letter by telling him not to reply as "I CAN NO LONGER WAIST [sic] MY TIME ON YOU." In February of 1987  some four months before her death  Madeleine again wrote to Kesselring telling him that he was "abnormal," that he was "destroying our relationship," and that he was "getting worse all of the time."
Kesselring responded with a letter of his own in the spring of 1987. He said he had "one last request" and asked her to return his engagement ring, his slides, and some other property she had in her possession. The tenor of the letter suggested that their relationship had ended. Finally, on May 23, 1987, just two weeks before she killed herself, Madeleine wrote a final, bitter letter to Kesselring. She told him he had given her "another perfect example this morning of a mentally ill person by showing me the cross[.] [T]his is an insult to Jesus who died for you." The letter accused Kesselring of being a "phony," a "hypocrite" and without compassion.
Contrary to this evidence, Kesselring testified that he and Madeleine were in love, and that by the time of her death they had "resumed the relationship as it was before." He dismissed the letters as the product of a "lover's quarrel." Finally, he testified that on the night before Madeleine killed herself, she professed her love for him, saying that "she realized the kind of man that I was and that we had good times."

C. The Expert Witness.

Nowak called Marie-Therese Mijoule, a translator and French lawyer, who testified that Madeleine's French background likely influenced the structure and phrasing of her will. Ms. Mijoule based her opinion on a number of factors. First, the will's structure is consistent with that commonly used in France. French wills typically first set forth a "universal legatee"  that is, a person who receives all of the testator's estate  followed by specific bequests which the universal legatee passes on to the subsidiary heirs. Here, Madeleine's bequest of "properties" to Nowak, followed by more specific bequests to Messrs. Kesselring and Vardanian, suggests that Nowak was to be treated as the universal legatee. This means that Madeleine intended "properties" to encompass both real and personal property.
Second, the unusual phrasing in the will shows French influence. Madeleine's designation of the will as her "Will and Testimony" is odd *1135 English usage. The customary term is "Will and Testament." However, Ms. Mijoule explained this would not be odd usage to a native French speaker because, in French, the word for "will" is "testament." Thus "Will and Testament" would seem redundant to a French speaker, while "Will and Testimony" would make more sense.
In a similar vein, Madeleine's use of the plural form of "properties" in the bequest to Nowak can also be explained by French influence. Ms. Mijoule explained that because Madeleine viewed Nowak as the universal legatee, whatever word she used had to represent for her a plurality of things. According to Ms. Mijoule, French speakers always have problems with the use of English collective nouns that take the singular form (e.g., "property"), because in French the counterpart words normally take a plural form. Thus, when Madeleine wrote the word "properties" she meant "all her goods" (the word is "biens" in French).
Based on this evidence, the trial court concluded that "properties" as used in the will referred to both real and personal property. The court rejected Kesselring's argument that "properties" referred only to real property. According to the court, that construction would violate the statutory presumption against intestacy because the personal property in the estate  such as furniture and automobiles  would not then pass under any provision of the will, since it is neither real property nor "money." (Prob. Code, § 6160.) The court further concluded that Madeleine's $550,000 interest in the SIFE Trust Fund was not "money" and therefore passed to Nowak as personal property, but that a $100,000 return of a life insurance premium was "money" which passed to Kesselring.

II

DISCUSSION
(1) "`The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.'" (Estate of Russell (1968) 69 Cal.2d 200, 205 [70 Cal. Rptr. 561, 444 P.2d 353].) (2) In reviewing a trial court's construction of a will, we are free to independently interpret the instrument as a matter of law unless the trial court's interpretation turned upon the credibility of extrinsic evidence or required resolution of a conflict in the evidence. (Estate of Hilton (1988) 199 Cal. App.3d 1145, 1169 [245 Cal. Rptr. 491]; Poag v. Winston (1987) 195 Cal. App.3d 1161, 1173 [241 Cal. Rptr. 330].) "The possibility that conflicting inferences can be drawn from uncontroverted evidence does *1136 not relieve the appellate court of its duty independently to interpret the instrument; it is only when the issue turns upon the credibility of extrinsic evidence, or requires resolution of a conflict in that evidence, that the trial court determination is binding." (Estate of Dodge (1971) 6 Cal.3d 311, 318 [98 Cal. Rptr. 801, 491 P.2d 385], citing Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 866, fn. 2 [44 Cal. Rptr. 767, 402 P.2d 839].)
(3) Most of the evidence in this case is not in conflict. However, there is one significant exception. The letters introduced by Nowak indicated that the relationship between Kesselring and Madeleine had deteriorated to the point of contempt and hatred. Nevertheless, Kesselring testified that by the time of Madeleine's death they had "resumed the relationship as it was before" and she had in fact professed her love to him on the night before she killed herself. This conflicting evidence was admissible as proof of the circumstances surrounding the execution of the will. (12 Witkin, Summary of Cal. Law (9th ed. 1990) Wills and Probate, § 245, p. 280.) Such surrounding circumstances include the relationship between the testator and a person claiming under the will and "the state of the testator's affection toward possible objects of his bounty." (4 Page on Wills (3d ed. 1961) § 32.8, pp. 263-265, fn. omitted.) Here, the trial court had to determine whether to believe the letters  which indicated a bitter relationship at or near an end  or Kesselring, who testified that the relationship was a loving one at the time Madeleine took her life. Even though the trial court's decision did not appear to "turn" on the resolution of this conflict, we must give the court's implied finding the deference to which all findings of fact are due. In any event, whether we apply the independent review or deferential standard, we believe the trial court correctly interpreted the will.

A. The Trial Court Properly Interpreted the Meaning of "Properties."

(4) The trial court first faced the task of interpreting the meaning of "properties" as used in the bequest to Nowak ("I leave my properties to Edwin Nowak"). We note first that since the term was not modified by the adjectives "real" or "personal" it could have meant one or the other or both. Thus, the term was ambiguous on its face and the trial court properly turned to extrinsic evidence and accepted rules of construction to discern its meaning. (Estate of Russell, supra, 69 Cal.2d at p. 206; Estate of Hilton, supra, 199 Cal. App.3d at p. 1169.)
(5) As indicated, the trial court concluded that "properties" referred to both real and personal property and that Nowak was, in effect, a residual beneficiary under the will. This interpretation is supported by accepted rules of construction and the evidence introduced at trial.
*1137 First, the interpretation is consistent with the rule that prefers a construction which avoids complete or partial intestacy. (Prob. Code, § 6160; Estate of Russell, supra, 69 Cal.2d at p. 213; Estate of Newmark (1977) 67 Cal. App.3d 350, 359 [136 Cal. Rptr. 628]; Estate of Burson (1975) 51 Cal. App.3d 300, 307 [124 Cal. Rptr. 105].) There is a presumption that the testator intended to dispose of all of his or her property. (Estate of Vanderhoofven (1971) 18 Cal. App.3d 940, 947 [96 Cal. Rptr. 260].) Had the trial court accepted Kesselring's argument that "properties" referred only to Madeleine's real property, then part of the estate would have passed by intestate succession, rather than under the provisions of the will. The estate included furniture, a mink coat, jewelry and automobiles. Since these items are neither real property nor "money," they would not have passed to either beneficiary under the will. By construing the word "properties" to mean both real and personal property, the trial court avoided this result.
Kesselring contends we should not apply the presumption against intestacy in this case because that portion of the estate which is neither money nor real property is a relatively small percentage of the entire estate ($9,925 out of $2.4 million). (6) (See fn. 5.) However, as we have indicated, the presumption applies to prevent both complete and partial intestacy. Kesselring has cited no authority for his contention that the presumption does not apply where only a small portion of the estate would pass by intestate succession.[4]
(7) The extrinsic evidence offered at trial also supports the trial court's interpretation of "properties." First, during her lifetime Madeleine expressed her intent to leave her entire estate to Nowak. She first expressed this intent orally to Nowak, and then apparently drafted an unsigned will carrying out that intent. Nothing occurred between the time Madeleine expressed this intent and the date of her death to indicate she had changed her feelings toward Nowak. On the other hand, there was ample evidence her relationship with Kesselring had deteriorated during that time.
Finally, Ms. Mijoule's expert testimony supported the notion that Madeleine considered Nowak her "universal legatee," and that she used the plural form of "property" to refer to all her possessions.
(8) In response to this evidence, Kesselring contends that Madeleine "habitually" used the word "properties" to refer to her real estate holdings *1138 and thus that term should be similarly limited in the will. However, the only evidence appellant cites to support this contention is a hearsay statement, taken out of context, in the deposition of a witness who did not appear at trial. Serop Vardanian, who knew Madeleine for only two months, testified that when he first met Madeleine he asked her what kind of work she did. According to Mr. Vardanian, she responded, "`I have properties, and I am running my own properties.' ... And I didn't ask her how many properties she had or what she had. She said she had a couple of properties, you know, and that's it." First, it is unclear from this testimony whether Mr. Vardanian was directly quoting Madeleine, or whether he was paraphrasing her response. Moreover, even if he did report her statement word for word, it hardly establishes that she "habitually" referred to her real estate holdings as "properties." One instance does not a habit make.
(9) Finally, Kesselring points out that Madeleine was a real estate professional, and that because of her consuming interest in real estate, we should read "properties" to mean real property. However, this argument also cuts the other way. If Madeleine were as familiar with real estate practice as Kesselring claims, then wouldn't she have been aware of the importance of distinguishing between real and personal property? The fact that she did not indicates she intended to use the word in its most inclusive sense.
In sum, the trial court correctly interpreted properties to mean both real and personal property.

B. The Bequest of "Money."

(10a) Having determined that Madeleine intended to leave Nowak all of her property that was not otherwise disposed of by the will, we must now determine what is included in the bequest of "my money" to Kesselring ("I leave my money to Lawrence Kesselring.").
The basic rule for interpreting a bequest of "money" was set forth in Estate of Boyle (1934) 2 Cal. App.2d 234 [37 P.2d 841]. There, the testatrix made several specific bequests and then left "all other money I may die possessed of after all my bills are paid" to six named beneficiaries. (Id., at p. 236.) The trial court concluded that this bequest of "money" included corporate stock held by the estate. The Court of Appeal disagreed and reversed. (11) The reviewing court stated: "Section 106 [now section 6162] of the Probate Code provides: `The words of a will are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another sense can be collected, and that can be ascertained.' There is no doubt that the word `money' when taken in its ordinary and grammatical *1139 sense does not include corporate stocks.... `In its usual and ordinary acceptance it means, gold, silver, or paper money used as a circulating medium of exchange, and does not embrace notes, bonds, evidence of debt, or other personal or real estate, and this popular and well understood meaning should be given to the word when used in a will, unless from a consideration of the entire instrument it was intended by the testator to have a broader meaning....' Also in 18 Ruling Case Law, at page 1270, we find the following: `Where there is nothing in a will calling for a construction of the word "money" in any other than its popular and legal meaning it will be confined to gold and silver and other circulating medium of the country, whether in the personal possession of the testator or deposited in the bank.'" (Estate of Boyle, supra, at p. 236; see also Estate of Broad (1942) 20 Cal.2d 612, 615-616; Estate of Stadler (1960) 177 Cal. App.2d 709, 712 [2 Cal. Rptr. 515]; Estate of Whitney (1958) 162 Cal. App.2d 860, 865 [329 P.2d 104]; Estate of Chamberlain (1941) 46 Cal. App.2d 16, 20 [115 P.2d 235].)
(10b) Here, there is nothing in the will calling for a construction of "money" in other than its popular and legal meaning. Thus, Madeleine's bequest of "money" is limited to "`circulating medium of the country, whether in the personal possession of the testator or deposited in the bank.'" (Estate of Boyle, supra, 2 Cal. App.2d at p. 236.) The trial court correctly concluded that the SIFE fund does not fall within this definition.
The SIFE Trust Fund was described by its director of sales as an open-ended, federally regulated investment company structured as an inter vivos trust to permit investors to avoid probate. SIFE is very similar to a mutual fund. The fund owns and manages a portfolio of securities, primarily financial institution stock. Investors purchase an interest in this pool of securities and the value of their interest is determined by the value of their pro rata share of the stock held in the fund. This value is set daily, and fluctuates with market conditions. SIFE representatives tell prospective investors that SIFE is not like a bank account; instead, the investor owns an interest in the stock market which may fluctuate in value.
In essence, the SIFE fund is a vehicle for holding securities. Like the corporate stock in Boyle, it does not fall within the popular and legal meaning of "money." (See also Estate of Chamberlain, supra, 46 Cal. App.2d at p. 20 [Bequest of "cash" did not include United States bonds or shares of stock.].) The trial court properly awarded this asset to Nowak.

C. The Cross-appeal.

(12) Finally, in his cross-appeal, Nowak contends the trial court incorrectly concluded that a $100,000 return of premium from a life insurance policy was "money" within the meaning of the bequest to Kesselring.
*1140 About one year before her death, Madeleine purchased a "single premium" life insurance policy for $100,000. The policy had a minimum guaranteed death benefit of $514,523. However, the policy provided that in the case of suicide within two years of the policy date, then "the amount payable will be limited to a return of the premium that was paid." Consequently, upon Madeleine's death, the insurer paid $100,000 plus accrued interest to her estate.
The insurance contract also provided that the policyholder could surrender the policy at any time for a guaranteed "cash value." The cash value consists of the premium paid plus accrued interest at a rate of not less than 4 percent per year, less mortality charges and a surrender charge, if applicable. According to Nowak's insurance expert, the cash value is "safe and insured."
In Estate of Chamberlain (1942) 56 Cal. App.2d 458 [132 P.2d 488], the court considered a situation which is analogous to that which confronts us here. There, the court had to decide whether some $10,000 on deposit with an insurance company was "cash" within the meaning of a will. The $10,000 was originally paid on a life insurance policy upon the death of the testatrix's husband. Instead of paying this amount directly to the testatrix, however, the insurance company retained the proceeds pursuant to a certificate which provided for the payment of quarterly interest plus additional annual dividends. The certificate provided that the principal amount plus any unpaid interest or dividends would be paid immediately to the testatrix's estate upon proof of her death. The testatrix could also withdraw the principal amount, subject to the insurance company's right to require three months' written notice of withdrawal. (Id., at pp. 464-465.)
In deciding that the certificate of deposit was in fact "cash," the court stated that "we must not overlook the fact that the money on deposit with the life insurance company was not only payable on demand (with possibly some delay) but it was payable to her estate immediately upon proof of her death. With no further action than that, the cash in the hands of her executor would be increased to the extent of $10,062.58.... We cannot distinguish between money on deposit in [a] bank and money on deposit with a life insurance company subject to withdrawal and payable to the estate of the depositor upon his death, ... It has been held proper to consider as cash sums of money which are due a testator and which are so mentioned in his will as to show that he expects to receive them before the will becomes operative. [Citation.] We think the same can be said of sums such as the life insurance money, which the testatrix knew would immediately upon her death be payable to her estate." (Estate of Chamberlain, supra, 56 Cal. App.2d at pp. 465-466.)
*1141 In the circumstances of this case, the $100,000 returned insurance premium is similar to the money on deposit in the Chamberlain case. Because Madeleine committed suicide, her estate was entitled to an immediate return of the premium paid. The insurance company in fact paid that premium plus accrued interest to the estate. Thus, when the administrator established proof of death by suicide the cash in his hands increased by $100,000 plus accrued interest. In these circumstances, we believe the returned premium is sufficiently akin to funds held on deposit at a bank to constitute "money" within the meaning of the will.[5]
The judgment is affirmed. Costs to be shared equally between the parties.
Merrill, J., and Chin, J., concurred.
NOTES
[1] The word "properties" was apparently first written "property"; the "-ies" was written over a "y."
[2] Mr. Vardanian (misspelled "Wardaman" in the will) disclaimed his bequest. However, the bequest to Mr. Vardanian was important for another reason. Madeleine met Mr. Vardanian about two months before her death. Thus, the reference to him in the will established that the will had been drafted no more than two months before her death.
[3] It is unclear from the record whether Madeleine divorced her husband or he died.
[4] We acknowledge that the presumption does not apply where the testator clearly intended that partial intestacy result. (Estate of Beldon (1938) 11 Cal.2d 108, 112 [77 P.2d 1052].) This occurs when "there can be no doubt about the meaning of the language which was used" in the will. (Ibid.) Here, however, there is doubt about the meaning of the language the testator used, and thus the presumption was properly applied in this case.
[5] We do not express any opinion regarding whether the full death benefit would have been "money" within the meaning of the will had Madeleine not died by her own hand.